Jason M. Collins
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P. O. Box 7909
Missoula, MT  59807-7909
Phone (406) 523-2500
Fax (406) 523-2595
jmcollins@garlington.com

Attorneys for Defendant Sheriff David Wendt

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| CHAD BURTON HILL, | CV-23-34-BU-DWM |
| Plaintiff, | |
| v. | BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| PAUL BURT, TED CALDWELL, FLYING J RANCH, LLP, BEAVERHEAD COUNTY SHERIFF DAVID WENDT, and DOES 1-10, | |
| Defendants. | |

4873-8992-1496

TABLE OF CONTENTS

Page

I.      INTRODUCTION………………………………………………………...1

        A.      Statement of Undisputed Facts…………………………………… 1

        B.      Hill's Claims……………………………………………………… 7

        C.      Standard of Review……………………………………………... 8

II.     ARGUMENT……………………………………………………………… 9

        A.      Hill's claims are contradicted by or unsupported by the
                undisputed facts of the record evidence, leaving him without
                sufficient proof to establish the elements of his claims……………… 9

                1.      Wendt is entitled to qualified immunity because there
                        is no evidence showing his affidavit contained statements he
                        knew were false or that he recklessly disregarded the truth…. 13

                2.      Hill's state law claims fail for a lack of proof and because
                        they are barred by the Public Duty Doctrine………………… 15

                3.      Hill's claim under the Montana Constitution fails because
                        the State has a compelling interest in investigating crimes
                        and because a search warrant is a recognized procedural
                        safeguard for the privacy rights of Montanans……………… 18

                4.      Hill's claims for Intentional Infliction of Emotional Distress
                        and Conspiracy similarly fail for a lack of proof……………. 19

III.    CONCLUSION……………………………………………………………24

CERTIFICATE OF COMPLIANCE………………………………………….. 25

CERTIFICATE OF SERVICE………………………………………………… 26

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)……………………………………………………. 8

*Bassett v. Lamantia*,
2018 MT 119, 417 P.3d 299…………………………………………… 16

*Brothers v. Monaco*,
363 F. Supp. 3d 1138 (D. Mont. 2019)………………………………….. 16-17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)………………………………………………….. 9

*Czajkowski v. Meyers*,
2007 MT 292, 172 P.3d 94…………………………………………… 23-24

*Dulaney v. State Farm Fire & Cas. Ins. Co.*,
2014 MT 127, 324 P.3d 1211………………………………………….. 15

*Fratzke v. Miller*,
No. CV 14-274-M-DLC,
2016 U.S. Dist. LEXIS 143387 (D. Mont. Oct. 17, 2016)……………………… 20

*Lal v. Cal.*,
746 F.3d 1112 (9th Cir. 2014)……………………………………………13-14

*Limberhand v. City of Billings Police Dep't*,
No. CV 20-00099-BLG-BMM-KLD,
2022 U.S. Dist. LEXIS 66871 (D. Mont. Feb. 23, 2022)……………………….. 8-9

*Liston v. Cnty. of Riverside*,
120 F.3d 965 (9th Cir. 1997)……………………………………………..14-15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)…………………………………………………….. 8-9

TABLE OF AUTHORITIES – CONT'D

Page(s)

**Cases**

*O'Doan v. Sanford,*
991 F.3d 1027 (9th Cir. 2021)……………………………………………9, 13-14

*Pearson v. Callahan,*
555 U.S. 223 (2009)……………………………………………………… 13

*Renenger v. State,*
2018 MT 228, 426 P.3d 559………………………………………….. 17-18

*Scott v. Harris,*
550 U.S. 372 (2007)…………………………………………………….. 9

*State v. Bullock,*
901 P.2d 61 (1995)…………………………………………………….. 18

*State v. Elison,*
2000 MT 288, 14 P.3d 456……………………………………………… 18, 20

*State v. Goetz,*
2008 MT 296, 191 P.3d 489………………………………………...18-20

*State v. Spady,*
2015 MT 218, 354 P.3d 590……………………………………………… 18

*White v. State,*
2013 MT 187, 305 P.3d 795………………………………………….. 21-22

**Rules**

Fed. R. Civ. P. 56(a)…………………………………………………….. 8

**Statutes**

42 U.S.C. § 1983…………………………………………………….... 7, 15, 19

Mont. Const. Art. II, § 10……………………………………………… 18

TABLE OF AUTHORITIES – CONT'D

Page(s)

**Statutes**

Mont. Const. § 11…………………………………………………………… 18

## I.      INTRODUCTION

David Wendt merits summary judgment for all the claims alleged by Chad Hill because he has mustered no admissible evidence to prove his theories of liability or damages beyond his own mere denials and conclusory allegations.  The Public Duty Doctrine bars Hill's state-law claims because they are all premised on the discretionary core function and duty of a law enforcement officer to investigate crimes, arrest those who perpetrate them, and provide gathered evidence to a prosecutor.  Even without the Public Duty Doctrine's bar against the state-law claims, these claims are doomed by Hill's lack of proof, particularly in that he has failed to prove by a preponderance of the evidence that any statement of the warrant application is false.  And finally, Wendt is entitled to qualified immunity for Hill's § 1983 claim because officers are immune from suit for warrant-based searches unless their warrant application lacks indicia of probable cause sufficient to render official belief in its existence unreasonable.

## A.      Statement of Undisputed Facts

David Wendt has been a law enforcement officer for decades, since January 1, 2022.  Statement of Undisputed Facts ¶ 1 (Aug. 13, 2024) ("SUF").  Before he became Beaverhead County Sheriff, he was a resident deputy of Beaverhead County, which is the position he held when the events alleged in Hill's Complaint occurred.  *Id*.  When he accepted the Beaverhead resident deputy position, around

April of 2019, Wendt moved to the township of Kidd, Montana where he lived with his brother-in-law Bill Briggs on Kezia Lane, while considering housing options for himself and his family. *Id*.

Down the street from Briggs's home, when Wendt moved in, Chad Hill was growing marijuana, something he had been doing since at least 2014. SUF ¶ 2. Hill had split his property into two addresses—91 Kezia Lane where Blue Ribbon Botanicals, LLC rented a barn from Hill to grow marijuana under a state-issued grow license, and 77 Kezia Lane, where Hill grew marijuana for himself under a personal medical marijuana license that allowed him to have four mature plants, four immature plants, and no more than one ounce on his person and 16 ounces locked up at home. *Id*. Hill has never been allowed to have a state license to grow marijuana commercially because he is a convicted felon following his agreement to a plea deal for possession of marijuana in Wyoming. *Id*.

Also living on Kezia Lane were Paul Burt and Ted Caldwell, who are principals in Flying J Ranch, LLP. SUF ¶ 3. They sued Hill on December 4, 2018, for violating covenants for the Kezia Lane subdivision, Foxley Minor. *Id*. Around the time Wendt moved into Briggs's place, in April 2019, Burt complained to Wendt that Hill was growing marijuana on his property, that there was traffic to Hill's property at all hours, and that shady characters were often visiting the property with cars that had out-of-state plates. *Id*. Wendt investigated Burt's

complaint and discovered there was a state-licensed grow at 77 Kezia Lane, where Hill lived.  Wendt told Burt the marijuana grow was licensed and did not pursue his investigation further.  *Id*.  Hill, Burt, and Flying J's suit against Hill ended with a bench trial in front of the Honorable Luke Berger, a Beaverhead County State District Judge, who issued an Order compelling Hill to cease the commercial grow at 91 Kezia Lane, which by that time had also been operated under the License of Lone Peak Caregivers, following a falling out between Hill and the owner of Blue Ribbon.  *Id*.

In the fall of 2019, Hill purchased a new property at 215 E. Bailey (the "Property") for further commercial marijuana grows, where he tended between 12 and 16 plants to start.  SUF ¶ 4.  Since he is a convicted felon and could not have a commercial marijuana license himself, Hill was hoping to legalize his grow by having his wife secure a commercial grow license, but she had not yet met the state's three-year residency requirement and she would not do so until April of 2020.  *Id*.

Hill allowed Lee Salmonsen, who had helped out with grows for Blue Ribbon on Kezia lane, to live in an RV at the Property, next to the Quonset Hut that was already on the Property and which was slated for Hill's future marijuana operation.  Salmonsen had driven the RV, which belonged to his mother, up from Arizona, and parked it at the Property.  SUF ¶ 5.  Salmonsen lived exclusively in

the RV, though he would on occasion shower in the Quonset Hut. *Id*. While parked at the Property, Salmonsen used a small amount of electricity to run a fan that would circulate the heat from a propane heater. He could only use one appliance at a time. To use the microwave, he had to turn off the fan or a breaker would trip. *Id*. Sometime while Salmonsen was living there, Hill hired an electrician, Richard Reyes, to wire the Quonset Hut for additional receptacles and fans, which were necessary for the marijuana plants' growth. *Id*.

Before his wife could procure her license, Hill began a large marijuana grow at the Property, well in excess of the 8 plants Salmonsen was allowed in total to have on the premises under his medical license. SUF ¶ 6. The grow at the Property in fact consisted of between 300–500 plants. *Id*. Hill meant for Salmonsen's medical license to provide cover for this operation—essentially to provide a plausible explanation as to why someone might smell marijuana around the premises. *Id*. Salmonsen had also seen and tended Hill's large illegal grow in Hill's basement, at his residence on 77 Kezia Lane, which usually had between 100 and 150 plants growing. *Id*.

Around early January of 2020 during his patrols, Wendt noticed unusual activity at the Property, which he believed belonged to Joe Richard. SUF ¶ 7. Particularly, Wendt noticed Hill's pickup. *Id*. After speaking to Joe Richard, Wendt learned Hill had bought the place. Wendt noticed a great deal of activity at

4

the Property over the months that followed and specifically noticed that the hut's

windows had been covered in black plastic.  Neighbors complained to him of a

strong, skunk-like smell.  *Id*.  From Burt's previous report, Wendt knew of Hill's

marijuana growing and decided to contact Devin Keller, who was an inspector

supervisor at DPHHS with expertise in the licensing and regulation of marijuana

and marijuana products; DPHHS which oversaw marijuana regulation in Montana

at the time.  *Id*.  Ultimately, Keller told Wendt that no grow had been registered at

the Property and that there was not a licensed grow in all of Lima.  *Id*.  It was not

unusual for law enforcement to contact Keller directly for licensing inquiries,

though the Department had set up an online form that dispatchers could use to

inquire about licensing without having to call him.  The form was completely

optional, however, and in any case, DPHHS was required to provide information to

law enforcement on the location and licensing of marijuana grows when requested,

even absent consent of a license holder.  *Id*.  Wendt then contacted the Lima power

company, Vigilante Electric, to inquire about the Property's power consumption

over the prior few months.  *Id*.  The respondent at Vigilante told Wendt there had

been a significant increase in power consumption at the Property, and that Richard

Reyes had recently performed electrical work for Hill at the Property.  *Id*.  Wendt

contacted Reyes, who told him that he had wired in grow lights and fans, and that

he had seen 15–20 marijuana plants in the building while working on it.  *Id*.

5

Wendt submitted the information he learned to Justice of the Peace Candy Hoerning in an Application for Search Warrant, which was in the form of a sworn affidavit.  SUF ¶ 8.  Among other things, Wendt stated he had probable cause to believe and did believe that the facts he uncovered in his inquiries meant that the offense of Criminal Possession of Dangerous Drugs with Intent to Distribute, among others, had been committed.  *Id*.  Justice Hoerning issued the warrant, which stated she was satisfied there was probable cause to believe contraband related to the possession of illegal dangerous drugs existed on the Property and commanded Wendt to search the Property for that evidence and bring it before her. *Id*.  What Wendt did not know was that Reyes had tipped off Hill.  *Id*.  Before Wendt could search the Property, Hill and his wife harvested what marijuana they could and loaded up an enclosed U-Haul trailer to take live plants to a property in Butte.  *Id*.

Justice Hoerning approved the warrant application and Wendt executed it on April 20, 2020.  SUF ¶ 9.  Despite Reyes's tip and Hill's efforts to move the grow, Wendt and the other deputies who conducted the search found approximately 27 pounds of marijuana trim in two plastic totes.  *Id*.  DPHHS did not permit any medical cardholder to possess 27 pounds of trim.  *Id*.  The trim belonged to Hill. *Id*.

Beaverhead County Sheriff's deputies arrested Hill and his wife on September 11, 2020, for possession with intent to distribute related to the marijuana found in the Quonset hut.  SUF ¶ 10.  The charges against Louisa Bissette, Hill's spouse, were dismissed without prejudice on the basis she had no ownership interest in the Property and contraband.  *Id*.  The charges against Hill were voluntarily dismissed without prejudice by the State's attorney general office, which took over the prosecution following the severe illness of Jed Fitch, the Beaverhead County Attorney.  *Id*.

## B.    Hill's Claims

Hill alleges Wendt made a false statement on his warrant application; that Devin Keller illegally provided Wendt the information that there were no valid marijuana licenses on the Property; and that "Everything discovered during the search should have been suppressed during the prosecution of Hill and Bissette." (Doc. 4 ¶ 97.)  He alleges among other things that criminal charges related to the search and arrest have unduly caused him emotional distress, loss of consortium, and economic harm.  (Doc. 4 ¶ 99.)  He alleges such things amount to several theories of legal liability against Wendt: Section 1983 liability under the Fourth and Fourteenth Amendments (Count I); Violation of Constitutional Rights Under the Montana Constitution (Count III); Negligence (Count IV); Negligent Infliction of Emotional Distress (Count V); Intentional Infliction of Emotional Distress

(Count VI); Conspiracy with Burt and Caldwell (Count VIII).  (Doc. 4 at 16-23, 25-26.)

## C.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The nonmoving party bears the burden to demonstrate that the fact in contention is material, and that the dispute is genuine.  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.  *Id.*.

To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted).  In determining whether such sufficient evidence exists, the Court must analyze all inferences from the underlying facts in the light most favorable to the nonmoving party.  *See Matsushita*, 475 U.S. at 587.  Yet the Court must view facts in the light most favorable to the non-movant only when there is a bona-fide dispute.  When a

rational trier of fact could not find for the non-moving party under the record taken as a whole, there is no genuine issue for trial. *Limberhand v. City of Billings Police Dep't*, No. CV 20-00099-BLG-BMM-KLD, 2022 U.S. Dist. LEXIS 66871, at *8 (D. Mont. Feb. 23, 2022) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (footnote omitted).

Entry of summary judgment is thus appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has met its initial burden, the burden shifts to the opposing party to establish a genuine issue of material fact exists. *Matsushita*, 475 U.S. at 586. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "In the absence of material factual disputes, the objective reasonableness of a police officer's conduct is 'a pure question of law.'" *O'Doan v. Sanford*, 991 F.3d 1027, 1035 (9th Cir. 2021) (citations omitted).

## II.     ARGUMENT

**A.     Hill's claims are contradicted by or unsupported by the undisputed facts of the record evidence, leaving him without sufficient proof to establish the elements of his claims.**

4873-8992-1496

9

Hill has set forth no evidence to show Wendt made false statements on his search warrant application or that he had an improper purpose to procure that warrant outside his duty to investigate crimes as a Beaverhead County Sheriff's Deputy. He admits the statements of Devin Keller recounted in the warrant application were not lies, but believes they were incorrect. SUF ¶ 11. He admits the Property had "a drastic increase in power usage." *Id*. He admits Richard Reyes performed electrical work in the Quonset Hut. *Id*. He admits he has no proof to contradict Wendt's sworn statement that Reyes told Wendt he had wired in grow lights and fans, though he believes the statement is incorrect. *Id.* He admits too, that there were in fact 15-20 plants that Reyes would have seen when working. *Id*. He admits Wendt's presence in Foxley Minor subdivision was not the reason he moved his grow operation onto the Property. *Id*. He admits Wendt never alleged the mere presence of the Quonset Hut was suspicious. *Id*. He admits the Flying J defendants filed suit against him in December 2018, but that Wendt did not move into the Foxley Minor subdivision until April 2019. *Id*. And Hill knew at all times that marijuana possession and growing was illegal under federal law. *Id*.

Hill had no financial interest in any licensed marijuana business, has no proof he was ever even employed by one, and was legally precluded from holding a grow license other than one for personal medical use that allowed for four mature

plants, and one pound, one ounce of product at any given time—without any gray areas.  SUF ¶ 12.  Hill has no evidence of Burt or Caldwell making any statement to Wendt about his grow operation on the Property and admits that although Burt complained about the grow operation on Kezia Lane, Wendt did not investigate it because there was a license associated with the address.  *Id.*

Documents and testimony from others further disprove his claims without any other evidence that would cause a genuine dispute of material fact.  Devin Keller testified that it was not uncommon for law enforcement officers to call him regarding grow-license inquiries, that officers were not required to use dispatch channels to do so, and that he was statutorily required to provide law enforcement information about marijuana licensing.  Keller remembers telling Wendt that there were no grow licenses in all of Lima, and that there were no licenses associated with the Property, though he acknowledged Salmonsen's address was likely incorrect on his card and that Keller initially misspelled Salmonsen's name when Wendt asked him specifically whether Salmonsen was licensed.  SUF ¶ 13.  Keller acknowledged there was no departmental requirement for a warrant prior to providing information about grow licenses to law enforcement.  *Id.*  Keller acknowledged that 27 pounds of marijuana exceeded the legal limits of licensure for any medical cardholder, and that the existence of 12–16 plants exceeded legal limits for medical cardholders, including Salmonsen.  *Id.*

Salmonsen testified that Hill was illegally growing marijuana in his home's basement and at the Property, to the tune of 300 to 500 plants in the downstairs alone—as more were kept upstairs for the next harvest.  SUF ¶ 14.  Salmonsen stated that the Property smelled of "skunk" when he was outside, and he could personally smell "marijuana skunk smell wafting through the air."  *Id*. Salmonsen's medical marijuana license was meant to provide plausible cover for law enforcement inquiries into Hill's illegal grow.  *Id*.  Salmonsen testified that most of the windows in the Quonset Hut were blacked out, and that "all the light cracks and crevices were blocked" because "Light during the bud phase of marijuana growing is very bad. So a hundred percent darkness is the goal" and the reason those windows were blocked at the Property.  *Id*.  Salmonsen affirmed that the 27 pounds of marijuana uncovered in the search belonged to Hill and was what remained of Hill's larger operation after he harvested and packed up what he could after being tipped off by the electrician.  Salmonsen noted too, that the electrician had not wired in grow lights *per se*, but that he had added additional electrical receptacles that supported powerful, plug-in style grow lights, along with fans. Specifically, he saw Hill use about a dozen such grow lights that were around 1500W and on for 16-18 hours per day until Hill evacuated the operation after being tipped off.  *Id*.  He testified also that the spike in power consumption was due to Hill's grow operation, not his meager use of electricity in his RV.  *Id*.

4873-8992-1496

12

Under these undisputed facts, no reasonable fact-finder could return a verdict for Hill's claims and there is no genuine issue for trial when considering the record as a whole.  Hill may have doubts, suspicions, or alternative stories, but the record is clear; his suspicions and alternate stories are refuted by the record and there is no material factual dispute for trial.

1.     **Wendt is entitled to qualified immunity because there is no evidence showing his affidavit contained statements he knew were false or that he recklessly disregarded the truth.**

Qualified immunity is an immunity from suit meant to prevent a case from erroneously going to trial by balancing the interests of holding public officials accountable for an irresponsible use of power with the need to shield them from harassment, distraction, and liability when reasonably performing their duties. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *O'Doan*, 991 F.3d at 1036. Qualified immunity shields police officers from liability for actions that result from mistakes of law, fact, or mixed questions of law and fact, and grants them room to make reasonable but mistaken judgments, thus protecting "all but the plainly incompetent or those who knowingly violate the law."  *Lal v. Cal.*, 746 F.3d 1112, 1116 (9th Cir. 2014); *Pearson*, 555 U.S. at 231 (citing *Butz v. Economou*, 438 U.S. 478, 507, (1978) to note that "qualified immunity covers 'mere mistakes in judgment, whether the mistake is one of fact or one of law'").  An officer's qualified immunity must be determined by considering "(1) whether there has been

4873-8992-1496                                                                                      13

a violation of a constitutional right; and (2) whether that right was clearly
established at the time of the officer's alleged misconduct." *Lal*, 746 F.3d at 1116
(citing *Pearson*, 555 U.S. at 232).  A court should faithfully apply these reviewing
standards "consistent with the purposes of qualified immunity" and may affirm an
official's qualified immunity solely on consideration of whether clearly established
law demonstrates the official's conduct was unconstitutional.  *O'Doan*, 991 F.3d at
1036.

   To survive an officer's entitlement to qualified immunity in a § 1983 claim
regarding a violation of the Fourth Amendment over a search warrant alleged to be
invalid, a Plaintiff must demonstrate the officer's deliberate or reckless disregard
for the truth in the search warrant affidavit and that but for the dishonesty, the
affidavit would not support a finding of probable cause.  *Liston v. Cnty. of
Riverside*, 120 F.3d 965, 972 (9th Cir. 1997).  In addition to deliberate dishonesty
or a reckless disregard for the truth, a Fourth Amendment violation occurs if "the
affiant intentionally or recklessly omitted facts required to prevent technically true
statements in the affidavit from being misleading." *Id.* at 973 (quoting *United
States v. Stanert*, 769 F.2d 1410 (1985)).  Thus, an officer is entitled to qualified
immunity if the plaintiff fails to "1) make a 'substantial showing' of deliberate
falsehood or reckless disregard for the truth and 2) establish that, but for the
dishonesty, the challenged action would not have occurred." *Liston*, 120 F.3d at

4873-8992-1496

14

973 (citing *Hervey v. Estes*, 65 F.3d 784, 788-89 (9th Cir. 1995).  Here, the

undisputed facts analyzed above demonstrate there is no evidence of intentional

falsity in the warrant application.  (Doc. 53-2.)  Indeed, the testimony of Keller,

Salmonsen, and Hill himself substantiate most of the facts alleged in the affidavit.

Those facts that are not specifically substantiated, like the statements of the

Bowmans or Cochran, are not contradicted by any evidence in this suit.  Yet they

are affirmed by the sworn testimony of Wendt's affidavit.  Hill has therefore failed

to meet his burden under the standard of *Liston* and Wendt is accordingly entitled

to qualified immunity for the § 1983 claim.  Hill's § 1983 (Count II) claim should

therefore be dismissed.

> **2.    Hill's state-law claims fail for a lack of proof and because they are barred by the Public Duty Doctrine.**

To prove state-law claims premised in negligence, a plaintiff must

demonstrate the defendant owed him a legal duty, that the defendant breached that

duty, that the breach of duty was the cause of his injury, and that he has been

damaged thereby.  The plaintiff's failure to offer proof for any one element

invalidates the claim and entitles the defendant to summary judgment.  *Dulaney v.*

*State Farm Fire & Cas. Ins. Co.*, 2014 MT 127, ¶ 10, 324 P.3d 1211.  Here, Hill

has failed to offer proof of any breach by Wendt.  And the undisputed factual

record analyzed above does not demonstrate a breach of any duty Wendt owed to Hill.

Additionally, Wendt owed Hill no duty because Wendt's allegedly negligent acts arose in the course of his investigation of Hill's criminal wrongdoing, all of which was within the context of Wendt's job and daily duties as a Beaverhead County Sheriff's deputy. Montana law provides that a law enforcement officer's duty to protect is owed to the public in general and that absent a special relationship, an officer does not owe a legal duty to protect and preserve the peace to an individual plaintiff. *Brothers v. Monaco*, 363 F. Supp. 3d 1138, 1153 (D. Mont. 2019) (citing *Bassett v. Lamantia*, 2018 MT 119, ¶ 12, 417 P.3d 299). "The doctrine has acquired the simple and oxymoronic description of 'a duty owed to all is a duty owed to none,' because a government entity or person has no duty to each individual when the government owes that same duty to each and every person." *Bassett*, ¶ 12 (citations omitted). "The doctrine simply shields officers from lawsuits stemming from an alleged failure to perform law enforcement duties." *Brothers*, 363 F. Supp. at 1153. Although *Bassett* held that injuries arising out of the "affirmative actions" of officers may fall outside the scope of the Public Duty Doctrine, the Montana Supreme Court later held that officers are shielded by the by doctrine when exercising their choice to pass along uncorroborated investigative findings—that they are protected by it when "investigating and

passing along evidence to a prosecutor, or county attorney" because such things are regularly performed by law enforcement as part of their mandate to protect and secure the general public welfare. *Brothers*, 363 F. Supp. 3d at 1153 (citing *Renenger v. State*, 2018 MT 228, ¶ 30, 426 P.3d 559). Here, Hill's state-law negligence claims all arise from duties Wendt had to protect and secure the general public welfare by investigating crimes and providing evidence to the County Attorney. (Doc. 4 ¶¶ 119–120 (negligent use of authority and performance of duties as officer); ¶¶ 123–126 (negligent acts of defendants by instigating criminal proceedings, intense scrutiny and financial distress caused by investigation from criminal proceedings and charged with felonies)).

Yet like in *Renenger*, even if Wendt's investigation and passing along evidence to the county attorney were not protected by the public duty doctrine, there is no evidence in the undisputed facts of this case that he acted in a negligent manner. *Renenger*, ¶ 32. The Montana Supreme Court acknowledged that many criminal cases are prosecuted to verdict based only on a victim or complaining witness's statement and do not require additional corroboration or resolution of other disputed testimony to proceed. *Id*. But ultimately, passing on such evidence to a county attorney is specifically not an affirmative act that would obviate the Public Duty Doctrine's protections, but rather a discretionary decision of a law enforcement officer to protect and preserve the peace that precludes Wendt's

17

liability for the claim. *Id*. ¶ 33.  Hill's negligence claims, Counts IV and V, should therefore be dismissed.

3. **Hill's claim under the Montana Constitution fails because the State has a compelling interest in investigating crimes and because a search warrant is a recognized procedural safeguard for the privacy rights of Montanans.**

Montana provides that its citizens are protected under Montana Constitution § 11 to be free from unreasonable searches and seizures and that under § 10, an individual's right to privacy may not be infringed without the showing of a compelling state interest. *State v. Bullock*, 901 P.2d 61, 75 (1995).  Reasonable searches are typically based on individualized suspicion and in assessing reasonableness under the Montana Constitution, a search warrant is a sufficient procedural safeguard for the potential infringement of a Montanan's constitutional privacy rights. *State v. Spady*, 2015 MT 218, ¶ 26, 354 P.3d 590.  Article II, § 10's right to privacy may be infringed in the presence of sufficient procedural safeguards like a search warrant and also when the state pursues its compelling interest in enforcing its criminal laws for the benefit and protection of other fundamental rights of its citizens. *State v. Elison*, 2000 MT 288, ¶ 53, 14 P.3d 456; *State v. Goetz*, 2008 MT 296, ¶¶ 39–40, 191 P.3d 489.

Here, Hill's claim for a violation of privacy rights under the Montana Constitution thus fails for the same reasons as his § 1983 claim: he has set forth no

record evidence that Wendt's search warrant application contained false statements, that it included reckless omissions to make it misleading, or that it was otherwise improvidently obtained by judicial deception.  The Montana Constitution is not a shield for criminals and was not meant "to make the home a safe haven for illegal activities."  *Goetz*, ¶ 40 (quote and citation omitted).  Hill's Quonset Hut is no exception.  Wendt properly pursued a compelling state interest by investigating Hill's activities by talking to neighbors, calling the electric company, interviewing witnesses, observing opaque windows, and noting the unusual comings and goings on the Property.  (Doc. 53-2.)  Wendt safeguarded Hill's privacy rights by procuring a warrant that was undisputedly reviewed and signed by a state justice of the peace who duly found probable cause to search the Property existed.  Hill has no other evidence for the claim beyond suspicion and conclusory allegations, which cannot withstand a motion for summary judgment supported by contradictory evidence.  His claim under the Montana Constitution (Count III) should therefore be dismissed.

### 4.      Hill's claims for Intentional Infliction of Emotional Distress and Conspiracy similarly fail for a lack of proof.

Wendt adopts the analysis and argument set forth by the Flying J Defendants § IV D as if fully set forth here.  (Doc. 52 at 17–18.)  Wendt adds only that the

lawful object of the alleged conspiracy[1] is also a compelling state interest—the enforcement of its criminal laws for the benefit and protection of other fundamental rights of its citizens.  *Elison*, ¶ 53; *Goetz*, ¶¶ 39–40.

Wendt has already argued the statute of limitations in a motion to dismiss and has been denied.  (Doc. 27.)  He does not mean to renew that argument here by adopting his codefendants' arguments based on the facts applicable to Hill's claims against them.  And Wendt was not a party to the Flying J lawsuit with Hill, so he does not assert the *res judicata* argument of Flying J Defendants.  Otherwise, Hill's conspiracy claim (Count VIII) should be dismissed for all the reasons expressed in Doc. 52 § IV D.

Hill's intentional infliction of emotional distress similarly fails for all the reasons expressed in the Flying J Defendants' brief in support of summary judgment, § IV C.  (Doc. 52 at 21-22.)  Wendt incorporates their analysis and argument as if fully set forth here.

Additionally, the Montana Supreme Court declined to hold that a criminal trial on its own supports a claim for emotional distress so severe that a reasonable person could not be expected to endure it.  *Fratzke v. Miller*, No. CV 14-274-M-DLC, 2016 U.S. Dist. LEXIS 143387, at *12 (D. Mont. Oct. 17, 2016) (citing

---

[1]  Wendt denies the existence of any conspiracy, lawful object or not.

*White v. State*, 2013 MT 187, ¶ 44, 305 P.3d 795).  In *White*, the Court analyzed

whether a district court's grant of summary judgment for defendant on a plaintiff's

claims for malicious prosecution should be upheld.  In the court below, the plaintiff

had alleged claims of bad faith, malicious prosecution, negligent infliction of

emotional distress, and intentional infliction of emotional distress.  The plaintiff

had been accused, investigated, and prosecuted for collecting benefits from the

State Fund workers' compensation program while continuing to work from his

garage building furniture.  The plaintiff, White, sued the State Fund and its

investigators.  *White*, ¶¶ 5–14.

        White's intentional infliction of emotional distress claim was premised on

his allegation that he "was forced to go through the indignity of being called a thief

and plead his case before a jury of his peers."  *Id.* ¶ 40.  The District Court

concluded White had neither alleged nor established the severe emotional distress

required for his claim to proceed.  *Id*.  The Montana Supreme Court agreed,

reasoning that summary judgment is appropriate for an emotional distress claim

lacking sufficient evidentiary support and that it had previously declined to uphold

such claims when other plaintiffs had alleged agony over credit reputation, severe

headaches, shoulder pain, bathroom difficulties, sleeplessness, overeating from

stress without evidence in support.  *White*, ¶ 43.  The Court noted too, it had not

upheld a claim from a grieving parent whose son had been killed by the

defendant's conduct because she had presented no evidence of a physical manifestation of grief, had not sought counseling, chose not to take anti-depressants, and because "countless parents grieve their child's death every year." *White*, ¶ 43.  The Court concluded that White's failure to provide evidence supporting his emotional distress claims made summary judgment appropriate, and that although he had alleged he suffered severe emotional distress from being compelled to defend himself against criminal charges, "every year many Montanans are forced to mount a criminal defense."  *White*, ¶ 44.

Here, Hill has similarly failed to muster evidence in support of his claim and has alleged his damages come from criminal prosecution.  Although he alleged he sought mental counseling for depression arising from the investigation and prosecution, he has provided no medical records in support, only billing statements evidencing four visits to Tueller Counseling services over the course of seven months.  SUF ¶ 15.  None of the billing statements specify the underlying basis for the visits nor the severity of symptoms.  And in any case, four visits to a counselor over seven months fails to demonstrate the kind of egregious and severe emotional distress—such that no reasonable person could be expected to endure it—sufficient for Hill's claim to withstand summary judgment.  *White*, ¶ 41.  Hill also acknowledges his depression is rooted in other sources beyond the allegations of this suit, he has only seen mental health counselors for depression and not other

symptoms, has not seen any other medical professionals about depression or other ailments, has never seen a marital counselor, has no regular physician, has had no physical illness that prevents him from working, and he does not take medication for depression.  SUF ¶ 16.  Hill has thus failed to meet his evidentiary burden to demonstrate he is suffering severe or serious emotional distress that would support his claim and has failed to overcome the Montana Supreme Court's conclusion that enduring a criminal prosecution cannot alone support his claim.  His claim, Count VI, should be dismissed on this basis alone.

But moreover, Wendt has explained above the propriety of his investigation and the well-supported factual basis for investigating Hill and procuring a warrant to search the Property.  Wendt's performance of his job duties—investigating crimes, procuring a warrant, searching the Property, and passing charges on to the County Attorney—are lawful acts rooted in a compelling state interest outside of any tort that could support the kind of "extreme and outrageous conduct" required to support a claim of intentional infliction of emotional distress.  *Czajkowski v. Meyers*, 2007 MT 292, ¶ 30, 172 P.3d 94.  Extreme and outrageous conduct supports liability only when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Czajkowski*, ¶ 30 (citing Restatement (Second) of Torts § 46, cmt. d).  Wendt's taking of citizen

4873-8992-1496

23

complaints, interviewing of witnesses, applying for a search warrant, executing that warrant after approval from a judge who deemed probable cause to search existed, and the subsequent passing of evidence for consideration by the county attorney does not rise to the level of conduct described in *Czajkowski*, ¶ 30.  Hill's intentional infliction of emotional distress claim (Count VI) should be dismissed for this reason as well.

### III.    CONCLUSION

Hill's claims against Wendt should be dismissed because Hill has failed to provide sufficient proof of his claims and because his allegations are contradicted by record evidence.  Hill's negligence claims are precluded by the public duty doctrine and Wendt is entitled to qualified immunity for Hill's § 1983 claim. Wendt's performance of his duties as a peace officer do not amount to the kind of outrageous conduct necessary to support a claim for intentional infliction of emotional distress and Hill has failed to prove he has endured extreme or serious distress arising from the facts he alleges.  Wendt therefore moves that he be granted summary judgment for all of Hill's claims against him.

DATED this 13th day of August, 2024.

/s/  Jason M. Collins
Garlington, Lohn & Robinson
Attorneys for Defendant Sheriff David Wendt

CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(d)(2)(E), I certify that this **Brief In Support Of Motion For Summary Judgment** is printed with proportionately spaced Times New Roman text typeface of 14 points; is double-spaced; and the word count, calculated by Microsoft Word 365, is 5,836 words long, excluding Caption, Certificate of Service and Certificate of Compliance.

/s/  Jason M. Collins
Attorneys for Defendant Sheriff David Wendt

CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2024, a copy of the foregoing document

was served on the following persons by the following means:

| | |
|---|---|
| _____ | Hand Delivery |
| _____ | Mail |
| _____ | Overnight Delivery Service |
| _____ | Fax (include fax number in address) |
| 1 | E-Mail (include email in address) |
| 1-2 | EM/ECF |

1.  Chad Hill
    P. O. Box 240080
    Dell, MT 59724
    chad@idahofishingoutfitters.com
       Plaintiff – Pro Se

2.  Peter B. Ivins
    Nicholas John Pagnotta
    Williams Law Firm
    P.O. Box 9440
    Missoula MT 59807-9440
    Peter@wmslaw.com
    nick@wmslaw.com
    hilde@wmslaw.com
    ellen@wmslaw.com
       *Attorneys for Paul Burt, Ted*
       *Caldwell and Flying J Ranch*


    _____
    /s/  Jason M. Collins
    Attorneys for Defendant Sheriff David Wendt

4873-8992-1496

26